**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

UNITED STATES OF AMERICA,

          Plaintiff,

v.                           CRIMINAL ACTION NO. 2:24-cr-00080

HENRY ROGERS,

          Defendant.

**MEMORANDUM OPINION & ORDER**

Before the Court is Defendant Henry Rogers' ("Defendant") Motion to Suppress All Evidence. (ECF No. 42.) For the reasons stated below, Defendant's motion is **DENIED**.

*I.    Background*

On May 14, 2024, Defendant was charged in a two count Indictment for possession with intent to distribute a quantity of methamphetamine in violation of 21 USC § 841(a)(1) and knowingly possessing a firearm in violation of 18 USC § 922(g) and 18 USC § 924(a)(8). (ECF No. 1.) These charges derive entirely from the stop and search of Defendant's vehicle on February 17, 2023.

A.  Before the Search

Prior to the stop and search, Trooper Logan Cox knew that on January 7, 2023, Trooper G. K. Davis arrested Defendant for driving under the influence in Nicholas County, West Virginia. (ECF No. 45 at 1.) The basis of that charge stemmed from a suspicion of drug use along with

1

Rogers' admission that he had smoked marijuana.  (*Id.*)  At the time of that arrest, Defendant drove a white Buick.  (*Id.*)  On January 14, 2023, Trooper Cox arrested Wayne Barnett in Nicholas County, West Virginia, and a search of Barnett's property yielded a significant amount of drugs.  (*Id.* at 2.)  Trooper Cox testified that Barnett said he received about six pounds of methamphetamine from Defendant every month.  (Hearing Tr. 14:5-14)  Trooper Cox also testified that Barnett said Defendant drove a white Buick and would store drugs in the fender wells of the trunk of his car.  (*Id.* at 14:5-6, 14:15-19.)

B.  The Initial Stop

On February 17, 2023, Trooper Cox and Trooper A.L. Shaffer conducted a traffic stop of a white Buick driven by Defendant after the car failed to stop at a stop sign.  (*Id.* at 10:14-20.) Trooper Cox made contact with Defendant and asked him for his license, insurance, and registration.[1]  (Govt. Exhibit 1, Rogers_Initial_Stop at 19:10:10.)  Trooper Cox explained the basis for the stop – failing to stop at a stop sign – and Defendant apologized.  (*Id.* at 19:10:15.) After receiving the requested documents, Trooper Cox briefly opened the driver's side door to confirm the car's VIN on the door jamb.  (*Id.* at 19:11:04.)  Trooper Cox closed the door upon confirming the information.  (*Id.*)  Thereafter, Defendant apologized again for not coming to a stop at the stop sign and acknowledged that he did "roll through" the stop sign.  (*Id.* at 19:11:23.)

Next, Trooper Cox asked Defendant to step out of the car and opened the driver's side door.  (*Id.* at 19:12:14.)  Trooper Cox asked Defendant about what he believed was a glass smoking pipe that was visible on the driver's seat.  (*Id.* at 19:12:20.)  Defendant stated that it was a "glass pipe" and Trooper Cox asked if Defendant used any drugs recently, to which Defendant

---

[1] The video time stamps referenced utilize the 24-hour clock that appears in the upper left-hand corner of the body camera footage.

responded in the negative.  (*Id.*)  Trooper Cox asked whether Defendant knew what the pipe was used for.  (*Id.* at 19:12:28.)  Defendant stated he does know and said, "there was a little girl in my car a while ago and I guarantee you she left that . . . in there."  (*Id.*)  When asked if he thought the girl could have left anything else in the car, Defendant stated he "didn't think so, but I'm sure you're going to look."  (*Id.* at 19:13:29.)  Trooper Cox then requested consent to search the car and he informed Defendant that he had a right to tell him no.  (*Id.* at 19:13:32.)  Defendant responded by saying "well I mean you already seen that laying there."  (*Id.*)  Defendant then stated that "she probably left some shit in it."  (*Id.* at 19:13:44.)  While talking at the rear of the car, Trooper Cox told Defendant that his pupils were enlarged, but Defendant again denied recent drug use.  (*Id.* at 19:13:51.)  Trooper Cox returned to the driver's side of the car and asked Defendant whether the glass smoking pipe contained any controlled substances.  (*Id.* at 19:14:30.)  Defendant responded by saying he did not "know what's in it, I mean she was doing something while she was in there.   She was pilfering all the time in her purse all the time she was in my car."  (*Id.*)

Thereafter, Trooper Cox informed Defendant that they will administer a field sobriety test ("FST") to make sure Defendant is able to drive.  (*Id.* at 19:14:45.)  Trooper Cox explained that they are administering the test because they found a glass pipe, Defendant's pupils are enlarged, his speech is slurred, and because Defendant ran a stop sign.  (*Id.* at 19:15:50.)  Trooper Cox directed Trooper Shaffer to conduct the FST and told Trooper Shaffer to "cover all the bases." (*Id.* at 19:16:33.)  While Trooper Shaffer began the FST, Trooper Cox returned to his cruiser to call for K9 assistance.  (*Id.* at 19:16:45.)  Trooper G. K. Davis confirmed he was enroute to the traffic stop.  (Govt. Exhibit 1, Rogers_Stop_Part_2 at 19:18:38.)

C.  The K9 Deployment

While Trooper Shaffer was completing the FST, Trooper Davis arrived with K9 Bruno. (Govt. Exhibit 1, Rogers_Stop_Part_4 at 19:29:10.)   Trooper Cox instructed Trooper Shaffer to take Defendant to the back of Cox's cruiser, at which point it appears the FST concluded.  (*Id.* at 19:29:56.)   Trooper Davis then rolled up Defendant's driver's side window and closed the door. (Govt. Exhibit 1, H_Rogers_Birch_River_K9 at 19:30:15.)   After rolling up the window, Trooper Davis spoke with Defendant about what the girl in Defendant's car may have possessed.  (*Id.* at 19:30:55.)   Defendant stated that "she had a little bag of white shit she put it back in her pocket and took off."  (*Id.* at 19:31:13.)   When Trooper Davis asked Defendant what he thought the "white shit" was, Rogers stated "I'd say meth."  (*Id.* at 19:31:20.)   Trooper Davis then removed K9 Bruno from his car and began conducting a sniff around the vehicle.  (*Id.* at 19:32:07.)   As Trooper Davis and K9 Bruno reached and continued around the car, Trooper Davis repeatedly asked K9 Bruno "where is it" and instructed K9 Bruno to "show me."  (*Id.* at 19:32:12.)   As K9 Bruno circled the car, he raised up on his hind legs and placed his front paws on the vehicle on several occasions, including on the car's closed windows, hood, and trunk.  (*Id.* at 19:32:20-19:32:55.)   K9 Bruno then alerted by sitting down by the passenger side of the car.  (*Id.* at 19:33:00.)   Following the alert, Troopers Cox and Shaffer searched the car and found a quantity of methamphetamine in the fender well of the trunk.  (*See* Rogers_Stop_Part_6 at 19:42:50.)

D.  Statements Against Defendant's Interests

After finding the methamphetamine, Trooper Cox read Defendant his Miranda rights. (Govt. Exhibit 1, Rogers_Stop_Part_7 at 19:56:40).   Thereafter, Trooper Cox arrested Rogers. (*Id.* at 19:57:19).   Following a question from Trooper Cox about the methamphetamine found in

the trunk, Rogers stated that the "best thing for me to do is not talk if I don't know nothing about it. . . ."  (*Id.* at 19:58:20).   While in Trooper Cox's cruiser enroute to the State Police detachment, Defendant asked Trooper Cox what was found in the car.   (Govt. Exhibit 1, Rogers_Transport_to_Office at 20:02:48.)   Trooper Cox responded with what was found and where.  (*Id.*)   Once at the detachment, Trooper Shaffer approached Trooper Cox and indicated that Defendant wanted to speak with Trooper Cox.  (ECF No. 45 at 5.)   Trooper Cox took Defendant to an office and asked Defendant about wanting to talk.  (Govt. Exhibit 1, Rogers_Conversation_at_Office at 21:37:22.)   Although the audio is difficult to discern, Defendant mentioned "lawyer, prosecuting attorney . . . the right people . . . but I want to walk."  (*Id.*)   Trooper Cox stated that he would "listen to [Defendant]."  (*Id.* at 21:37:41.)   Defendant then stated that "I'll put you in with the cartel."  (*Id.* at 21:37:45.)   Trooper Cox responded with "keep going, I'm listening to you."  (*Id.*)   Defendant repeated that he can put the police in with the cartel.  (*Id.*)   Defendant then stated "I want a lawyer, prosecutor."  (*Id.* at 21:38:24.) Trooper Cox responded that he understood Defendant wanted it to be "official," but Defendant could not have a lawyer and prosecutor at that moment in time.  (*Id.* at 21:38:30.)   Trooper Cox stated that [the police] were getting a search warrant on his vehicle.  (*Id.* at 21:38:44.)   Defendant responded that he could tell Trooper Cox exactly what was in the car and where, but could not do so without a deal.  (*Id.* at 21:38:50.)   Trooper Cox told Defendant that he would make a phone call.  (*Id.* at 21:39:30.)

Trooper Cox then obtained a search warrant to continue the search of Defendant's car after it was towed.  (ECF No. 45 at 6.)   Prior to leaving the detachment with the search warrant, Defendant told Trooper Cox where he would find additional methamphetamine and a firearm.

(*Id.*)  This information was provided without an attorney present and off camera.  (ECF No. 42 at 3.)  Trooper Cox found both items where Rogers said each would be hidden.  (ECF No. 45 at 6.)

## II.    *Analysis*

Defendant is seeking to suppress all evidence seized from his vehicle on February 17, 2023, all evidence seized in the subsequent search, and any statements or confessions made by Defendant at the police detachment.  (ECF No. 42 at 1.)  Defendant advances four arguments in support of suppressing the evidence: (1) Trooper Cox's opening of Defendant's car door without consent constituted an unconstitutional trespass, (*Id.* at 5); (2) the troopers exceeded the scope and duration of the stop when they abandoned the mission of the initial stop and embarked on a drug investigation, (*Id.* at 4); (3) K9 Bruno's actions were an unconstitutional search, (*Id.*); and (4) Defendant's statements made after invoking his right to counsel should be suppressed.  (*Id.* at 6.)

### A.  The Opening of Defendant's Car Door

Defendant argues that "Trooper Cox repeatedly opening [Defendant's] car door without his consent similarly constitutes unconstitutional trespasses upon [Defendant's] property interests in violation of *United States v. Jones*, 565 U.S. 400 (2012)."  (*Id.* at 5.)  Outside of the above quote, Defendant did not offer any other arguments or caselaw to support his assertion, and the alleged unconstitutionality of opening Defendant's car door was not raised in his supplemental brief.  (*See* ECF No. 58.)  The Government argues that on the first instance of opening the door, the door was only minimally opened, and the only information Trooper Cox gained was the VIN.  (ECF No. 45 at 16.)  The Government also argues that there is no reasonable expectation of privacy in VINs located on the dashboard or inside the doorjamb of a car.  (*Id.*) (citing *New York*

6

*v. Class*, 475 U.S. 106, 118 (1986)).    On the second instance of opening the door, the Government argues that Trooper Cox only did so after viewing the glass smoking pipe in plain sight and gained no information from opening the door.    (*Id.*)

Prior to the K9 deployment, Trooper Cox opened Defendant's door twice – first to check the VIN on the door and second when asking Defendant to step out of the car.    (*Supra* Part I.B.)    In the first instance, Trooper Cox testified that he "opened the door enough to see the VIN, to confirm that the vehicle had insurance."    (Hearing Tr. at 17:4-5.)    In the second instance, Trooper Cox testified that he opened the door when he told Defendant to get out of the car because he "began observing furtive movements, and [he] had seen the clear glass pipe beside [Defendant's] hip."    (*Id.* at 31:21-24, 32:3-7.)

The Fourth Amendment of the United States Constitution gives people the right to be secure in their "effects[] against unreasonable searches."    U.S. Const. amend. IV.    In *United States v. Jones*, the Supreme Court held that a Fourth Amendment search may occur when the government: (1) trespasses upon a constitutionally protected area (2) to obtain information.    565 U.S. 400, 404-05 (2012).    Trespassory searches are different from searches that violate an individual's reasonable expectation of privacy.    *Id.* at 409 (holding that the *Katz* reasonable expectation of privacy test has been added to, not substituted for, the common-law trespassory test).

The first question is whether Trooper Cox trespassed against an effect that is protected by the Fourth Amendment.    This question is easily answered, as "[i]t is beyond dispute that a vehicle is an 'effect' as that term is used in the [Fourth] Amendment."    *Jones*, 565 U.S. at 404.    The second question is whether Trooper Cox trespassed upon the vehicle.    In contending that a

trespass occurred, Defendant only cites to *Jones*.   In *Jones*, the police "physically occupied private property for the purpose of obtaining information" by installing a GPS tracker on the undercarriage of a suspect's car which they used to track his movements for 28 days.   *Id.* at 403-04.   In doing so, the government did more than briefly touch the vehicle, but rather "physically occupied" it for an extended period of time.   Here, Trooper Cox opened Defendant's car door just enough to read the VIN and closed it immediately thereafter.   (*Supra* Part I.B.)   Trooper Cox's opening of the door was a minimal and inconsequential touching which does not constitute a trespass.   *See United States v. Macias*, 2018 WL 6600271 at *2 (E.D. Wis. 2018) (holding that an officer who cupped his hands on a window and peered inside a car did not commit a trespass.) Trooper Cox's action in briefly touching the door is unlike the 28-day physical occupation of a GPS tracker attached to a car.   The third question is whether Trooper Cox engaged in the conduct for the purpose of obtaining information.   This question is also easily answered because Trooper Cox testified that he opened the door for the purpose of checking the VIN on the inside of the door. (Hearing Tr. at 31:5-17.)   Trooper Cox checked the VIN for the purpose of obtaining information about the vehicle's insurance status.   (*Id.*)   Therefore, although the door was opened to obtain information, a trespassory search did not occur because Trooper Cox did not trespass upon Defendant's vehicle.

The analysis does not end here, however, as the Fourth Amendment only applies to searches that are "unreasonable."   U.S. Const. amend. IV.   In *New York v. Class*, an officer opened a defendant's car door to look for the VIN in the doorjamb.   475 U.S. 106 (1986).   When the officer did not find the VIN on the doorjamb, he reached into the car's interior to move some papers obscuring the area where the VIN is located on the dashboard.   *Id.*   In doing so, the officer

saw the handle of a gun and the defendant was subsequently arrested for criminal possession of a weapon. *Id.* The Supreme Court held that a search occurred when the officer reached into the car, however, the search was reasonable because there is no reasonable expectation of privacy in the VIN locations "either inside the doorjamb, or atop the dashboard and thus ordinarily in plain view of someone outside the automobile." *Id.* at 118. The Court came to this conclusion "because of the important role played by the VIN in the pervasive governmental regulation of the automobile and the efforts by the Federal Government to ensure that the VIN is placed in plain view." *Id.* at 113. Therefore, even if a trespassory search occurred, the search would have been reasonable because Trooper Cox needed to ascertain the VIN pursuant to the initial traffic stop.

The same conclusion applies to the second instance of Trooper Cox opening Defendant's door. In this instance, Trooper Cox only momentarily touched the door, and only did so after seeing the glass smoking pipe in plain sight. (*Supra* Part I.B.) Furthermore, Trooper Cox did not open the door to obtain information, so the second element in the analysis is not met. However, even if the above two elements were satisfied to make it a trespassory search, it still would have been a "reasonable" search because there was a glass smoking pipe in plain sight. Therefore, Defendant's argument that Trooper Cox unconstitutionally trespassed upon Defendant's property interests by opening his car door is unpersuasive.

B. The Scope and Duration of the Stop

Defendant argues that the Troopers exceeded the appropriate scope and duration of the traffic stop when they "abandoned the mission of the stop" and "embarked on an unfounded and overly broad drug investigation." (ECF No. 42 at 4.) Defendant further argues that because the FST ended as soon as Trooper Davis arrived with K9 Bruno, the delay, even if for mere moments,

ran afoul of *Rodriguez v. United States*, 575 U.S. 348 (2015).   Defendant also argues that Trooper Cox knew that he needed to wait until the K9 arrived, as evidenced by his testimony, and thus engaged in actions to delay the stop until the K9 arrived.   (ECF No. 58 at 19-20.)   This argument includes the assertion that the goal of the FST was to wait until the K9 unit arrived because the FST indeed ended as soon as the K9 unit arrived.   (*Id.* at 21-22.)   Finally, Defendant argues that because the CAD shows that Defendant's information was returned at 19:21, "that part of the traffic stop should have been concluded."   (*Id.* at 21.)   On the other hand, the Government argues that Trooper Cox "had reasonable suspicion to extend the stop beyond the time necessary to issue a citation" based on the pipe in plain view and Defendant's "mildly slurred" speech, enlarged pupils, and because he did not stop at a stop sign.   (ECF No. 59 at 2-3.)

"A traffic stop constitutes a seizure under the Fourth Amendment and is thus subject to a reasonableness requirement."   *United States v. Perez*, 30 F.4th 369, 374 (4th Cir. 2022) (internal quotation marks omitted). "Reasonableness . . . is measured in objective terms by examining the totality of the circumstances."   *Ohio v. Robinette*, 519 U.S. 33, 39 (1996).   "[A] traffic stop is reasonable if (1) the stop is legitimate at its inception and (2) the officer's actions during the stop are reasonably related in scope to the basis for the stop."   *Id.* at 375.   "If a police officer observes a traffic violation, he is justified in stopping the vehicle for long enough to issue the driver a citation and determine that the driver is entitled to operate his vehicle."   *United States v. Branch*, 537 F.3d 328, 337 (4th Cir. 2008).   However, "an officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop . . . [but] he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual.   *Rodriguez v. United States*, 575 U.S. 348, 355 (2015).   For reasonable suspicion, "a police officer must offer

specific and articulable facts that demonstrate at least a minimal level of objective justification for the belief that criminal activity is afoot." *United States v. Bowman*, 884 F.3d 200, 213 (4th Cir. 2018) (internal quotation marks omitted). "When reviewing whether an officer developed reasonable suspicion, we look at the totality of the circumstances." *United States v. Villavicencio*, 825 Fed.App'x 88, 97 (4th Cir. 2020).

The traffic stop and subsequent search can be broken down into three distinct parts: (1) the initial stop for failing to stop at a stop sign; (2) the field sobriety test; and (3) the K9 deployment and subsequent search. (*Supra* Part I.B.) At the suppression hearing, Defendant's counsel stated that he did not intend to challenge the initial stop. (Hearing Tr. at 4:23-25.) Defendant also did not raise an issue with the initial stop in his briefs, therefore, the analysis can move to the second part of the stop.

Approximately two minutes after making contact with Defendant, Trooper Cox asked Defendant to step out of his car and asked about the glass pipe. (*Supra* Part I.B.) While discussing the nature of the pipe with Defendant, Trooper Cox noted that Defendant's speech was slurred and his pupils were enlarged. (*Id.*) At 19:14:45, less than five minutes after making initial contact with Defendant, Trooper Cox informed Defendant that he would receive a FST. (*Id.*) Trooper Cox then directed Trooper Shaffer to conduct the FST and "cover all the bases." (*Id.*) Trooper Shaffer then began conducting the FST. (*Id.*)

At this point, while the mission of the initial stop had ended, Trooper Cox had sufficient reasonable suspicion of impaired driving to continue the detention of Defendant. *See Rodriguez*, 575 U.S. at 355. As Trooper Cox told Defendant during the stop, this reasonable suspicion was based on the pipe in the car, Defendant's slurred speech and enlarged pupils, and Defendant's

failure to stop at the stop sign.    These facts on their own establish the reasonable suspicion that is ordinarily demanded during an impaired driver investigation.    Therefore, Defendant's argument that the initial "part of the traffic stop should have been concluded" when Trooper Cox received Defendant's license and registration information as shown in the CAD report is unpersuasive.

Furthermore, Defendant has suggested that by checking the time and telling Trooper Shaffer to "cover all the bases" during the FST, Trooper Cox was attempting to delay the stop until the K9 unit arrived.    (Hearing Tr. at 90:8-12.)    However, Troopers Cox and Shaffer testified that because Trooper Shaffer was still in training, the statement to "cover all the bases" was Trooper Cox conveying to Trooper Shaffer that he should make sure to do everything correctly.    (*Id.* at 42:3-7, 90:8-16.)    Even if there was an ulterior motive, which the record does not indicate, "reasonable suspicion is an objective test based on the facts within the knowledge of the officer and not the officer's subjective beliefs."    *Walker v. Donahoe*, 3 F.4th 676, 686 (4th Cir. 2021) (internal quotation marks omitted); *see United States v. Lara*, 2023 WL 2250788 (10th Cir. 2023) ("*Rodriguez* says nothing about the subjective intent of police officers in performing their duties. Rather, *Rodriguez* addresses the issue solely in objective terms").    Here, the facts provide objective reasonable suspicion to detain Defendant for the purposes of an impaired driver investigation regardless of Trooper Cox's subjective intent.

Finally, Defendant further argues that because the FST ended as soon as the K9 unit arrived, "the field sobriety test was merely a pretext to keep [Defendant] there until the K9 unit arrived."    (ECF No. 58 at 22.)    Troopers Cox and Shaffer testified that Trooper Shaffer completed the last test of the FST as the K9 unit was arriving on scene.    (Hearing Tr. at 50:7-12, 78:16-23.)    Troopers Cox and Shaffer also testified that Defendant failed the FST.    (*Id.* at 50:13-

12

14, 83:21-25, 84-85.)    During the FST, Trooper Shaffer conducted four tests but testified that he was unsure of how many tests he was authorized to conduct.    (*Id.* at 88:8-91:4.)    Trooper Shaffer also testified that a FST normally takes between 10 and 15 minutes.    (*Id.* at 88:6-7.)    Here, the FST began at approximately 19:16:45.    (*Supra* Part I.B.)    The K9 Unit arrived at 19:29:10, approximately 12 minutes and 40 seconds after the start of the FST.    (*Id.*)    While it is concerning that Trooper Shaffer was unable to articulate how many tests he was authorized to administer, the time it took to conduct the FST was within the time window that Trooper Shaffer testified was normal for a FST.    Furthermore, the fact that Defendant failed each test supports the Troopers' belief that reasonable suspicion existed, thus providing more support that the FST was not pretextual. [2]    Therefore, conducting the FST did not unconstitutionally extend the stop of Defendant.

The third part of the stop involves the K9 deployment and subsequent search after K9 Bruno alerted on the passenger side of the car.    Trooper Davis and K9 Bruno arrived at 19:29:10 and Trooper Davis inspected the interior of Defendant's car and rolled up the driver's window at 19:30:15.    At 19:30:55 Trooper Davis questioned Defendant about what substance the girl may have had, and at 19:32:07, approximately three minutes after arriving, the K9 sniff began.    (*Supra* Part I.C.)    Defendant has not alleged that this window of time was an impermissible delay. Therefore, upon analyzing each independent portion of the stop and search, the Troopers did not unconstitutionally prolong the duration of the stop.

---

[2] Failing the FST also gave the Troopers probable cause to arrest Defendant for driving under the influence, which would have resulted in a further detention of Defendant regardless of the K9's simultaneous arrival time.

13

C.  K9 Bruno's Actions

Defendant argues that K9 Bruno's behavior, specifically his "repeated physical intrusion upon the exterior of the car," was an unconstitutional trespass in violation of *United States v. Jones*. Defendant also challenges K9 Bruno's reliability, certification, and training as a drug detection dog and argues that his alert did not provide probable cause to search the car.  (ECF No. 42 at 4.)

1.  The Alleged Trespass

Defendant argues that a Fourth Amendment search occurred when K9 Bruno (1) trespassed against the vehicle (2) for the purpose of obtaining information about the vehicle.  (ECF No. 58 at 5-6.)  Defendant also argues that K9 Bruno's actions can be attributable to the Government because he has an "extensive history of upping onto vehicles and it is clear that is something he has been trained to do and does regularly when searching vehicles."  (*Id.* at 6.)  In response, the Government argues that K9 Bruno's contact was brief and did not constitute a physical occupation, thus not making it a trespass.  (ECF No. 59 at 10.)  The Government also argues that K9 Bruno's actions are not attributable to the Government because he was acting on instinct.  (*Id.* at 11.)

In support of his argument, Defendant relies on three cases: (1) *United States v. Jones*; (2) *Florida v. Jardines*, 569 U.S. 1 (2013); and (3) *United States v. Corbett*, 718 F. Supp. 3d 537 (S.D. W. Va. 2024).  As previously discussed, in *Jones*, the Supreme Court held that a Fourth Amendment search may occur when the government: (1) trespasses upon a constitutionally protected area (2) to obtain information.  565 U.S. 400, 404-05 (2012).  In *Jardines*, the Supreme Court extended *Jones* to the government's use of dogs in the curtilage of a home.  Finally, in *Corbett*, the Court held that a K9 trespassed when he planted his paws on the defendant vehicle's open windowsills and "penetrated" into the car.  718 F. Supp. 3d at 561-62.  The *Corbett* court

14

further held that the K9's behavior was attributable to the government because his trespasses were "the result of deliberate, repeated, and intentional training to 'up' onto vehicles while searching for narcotics, enabling simultaneous penetration in open windows when, as in this case, the canine is not restrained." *Id.* at 563. The *Corbett* Court examined whether the K9's actions were attributable to the Government because many appellate courts pre-*Jones* looked to whether the dogs' actions were instinctual. *Id.* at 562. *See United States v. Sharp*, 689 F.3d 616, 620 (6th Cir. 2012); *United States v. Pierce*, 622 F.3d 209, 214 (3d Cir. 2010); *United States v. Vazquez*, 555 F.3d 923, 930 (10th Cir. 2009); *United States v. Lyons*, 486 F.3d 367 (8th Cir. 2007). Therefore, so as not to disturb the approach in *Sharp* and *Pierce*, the *Corbett* court updated the analysis in accordance with *Jones* to establish a framework requiring: (1) a trespass (2) for the purpose of obtaining information (3) that is attributable to the government. *Id.* at 559-60. This Court finds the framework persuasive and applies it here.

First, it must be determined whether K9 Bruno committed a trespass under *Jones*. Here, prior to the K9 sniff, Trooper Davis went to Defendant's car and rolled up the driver's side window. (*Supra* Part I.C.) At the beginning and throughout the dog sniff, Trooper Davis told K9 Bruno to "show me" and asked K9 Bruno "where is it." (*Id.*) As K9 Bruno circled and sniffed around the car, he repeatedly jumped onto the car with his front paws, including around the windows, trunk, and hood. (*Id.*) Trooper Davis did not tell K9 Bruno to jump onto the car, and there is no indication that Trooper Davis physically directed him onto the car either. (*Id.*)

The caselaw as to K9 trespasses on the exterior of cars with closed windows is scant and divided. *See United States v. Chacon*, 701 F. Supp. 3d 821, 828 (S.D. Iowa 2023) ("Absent police misconduct, [however,] the instinctive actions of a trained canine do not violate the Fourth

Amendment.   In this case, there was no convincing evidence to show that the trooper directed the drug dog to make any physical contact with the vehicle.") (internal citations and quotation marks omitted); *see State v. Bauler*, 8 N.W. 3d 892, 900 (Iowa 2024) (holding that "[T]he dog sniff of [the defendant's] vehicle did not involve an extended physical occupation or physical intrusion akin to that in *Jones*.   Instead, it involved only fleeting contact with the exterior of a vehicle."); *but see State v. Dorff*, 526 P. 3d 988, 999 (Idaho 2023) (finding a *Jones* trespass where a drug dog "jumped up onto the door[ ] and planted his two front paws on the door (and then the window) as he sniffed the upper seams of the vehicle").   It is important to differentiate cases where the windows are open and the dog penetrates into the vehicle because a car's interior is an explicitly protected space under the Fourth Amendment.   *See Class*, 475 U.S. at 114-15; *Jones*, 565 U.S. at 410 ("In *Class* . . . we concluded that an officer's momentary reaching into the interior of a vehicle did constitute a search").

This Court finds that a *Jones* trespass does not exist in this case.   First, the facts are different from those in *Corbett* because K9 Bruno did not penetrate into the vehicle's interior, which has been recognized as a protected space.   Second, *Jones* trespasses have been attributed to the physical occupation of protected spaces, not merely repeated touches.   565 U.S. at 404-05 ("It is important to be clear about what occurred in this case: The Government physically occupied private property for the purpose of obtaining information.   We have no doubt that such a physical intrusion would have been considered a 'search' within the meaning of the Fourth Amendment when it was adopted.")   Therefore, even if the exterior of a vehicle is entitled to the same protection as its interior, there is no physical occupation of that space here.   To reiterate, in *Jones*, a GPS tracker was placed on a car for 28 days which provided the Government with over 2,000

pages of data.  *Id.* at 403.  Here, a K9 placed his paws on the exterior of a vehicle, and while it occurred several times, it is not analogous to the long-term physical occupation that occurred in *Jones*.  *See United States v. Owens*, 2015 WL 6445320 at *9 (D. Me. 2015) (holding that placing a GPS device on a car for 28 days is "far more physically intrusive" than an officer's momentary contact with a car's hood, thus not applying *Jones*.)  Therefore, K9 Bruno's actions in placing his paws on Defendant's car do not constitute a trespass as applied in *Jones*.

The second step of the *Jones* analysis is to determine whether the trespass occurred for the purpose of obtaining information.  A "[dog] sniff is intended to detect ordinary criminal wrongdoing."  *Perez*, 30 F.4th at 375.  Here, the Government does not dispute that K9 sniffs are used to obtain information.  (ECF No. 45 at 12) ("A drug-sniffing dog . . . is undoubtedly a tool used by law enforcement to find things (drugs) or to obtain information (about the presence or absence of drug odors)").  Therefore, this second step is satisfied.

The final step of the *Jones* analysis as applied to dog sniffs is to determine whether the dog's actions are attributable to the government.  Trooper Davis testified that K9 Bruno would touch the car when "I would say he's caught an odor high coming out of the seam, and he instinctively followed that odor high on the seam. That is why he would jump up to follow the seam as best he could."  (Hearing Tr. at 109:11-14.)  Trooper Davis testified that this was not the result of him giving commands to K9 Bruno.  (Id. at 109:15-17.)  Trooper Davis would allow K9 Bruno to put his paws onto cars "to let him follow the odor."  (Id. at 124:8-12.)  Furthermore, Trooper Davis testified that K9 Bruno did not receive training to not put his paws onto cars because "I'm not going to teach him not to follow-up, because if the scent is high for him, then he's not going to get the scent high."  (Id. at 127:14-19.)

17

In the context of dog bites, the Fourth Circuit has held that officers cannot avoid responsibility when dogs "behave[] exactly as [they are] trained to do."  *Melgar ex rel. Melgar v. Greene*, 593 F.3d 348, 355 (4th Cir. 2010).   In *Corbett*, the Court held that the K9's actions were attributable to the Government because they "were not alone instinctual; rather, they were the result of deliberate, repeated, and intentional training to 'up' onto vehicles while searching for narcotics."   718 F. Supp. 3d at 563; *see Vazquez*, 555 F.3d at 930 (upholding the legality of a sniff when "(1) the dog's leap into the car was instinctual rather than orchestrated and (2) the officers did not ask the driver to open the point of entry, such as a hatchback or window, used by the dog.") A dog acts instinctively when it acts "without assistance, facilitation, or other intentional action by its handler."  *Pierce*, 622 F.3d at 214.

Here, the Court finds that K9 Bruno was acting on instinct when placing his paws onto Defendant's car while following an odor, rather than doing so as a result of training or the direction of his handler.   As Trooper Davis testified, he did not physically or orally direct K9 Bruno to jump on the vehicle.   Furthermore, Trooper Davis testified that if K9 Bruno detects a high odor, "instinctively, he's going to go high with that odor."   (Hearing Tr. 124:3-7.)   While it does appear that K9 Bruno has received at least some training to jump onto cars through an "up up" command, it was not used in this instance, and Trooper Davis testified that it is only used on taller vehicles. (*Id.* at 109:18-110:8.)   Here, the facts indicate that K9 Bruno placed his paws on the vehicle because he was trained to instinctively follow odors, not because he was trained to jump onto the car or directed by Trooper Davis to do so.   K9 Bruno's actions in this instance of placing his paws onto the car were instinctual and not attributable to the Government.   Therefore, while K9 Bruno's

sniff was used to obtain information, it was not a trespass and was not attributable to the Government, making the sniff not a Fourth Amendment search under *Jones*.

2. K9 Bruno's Reliability and Certification

Defendant also challenges K9 Bruno's "reliability, certification and training as a drug detection dog and maintains that the 'alert' in this case fails to provide probable cause to believe his vehicle contained illegal drugs as contemplated by *Illinois v. Caballes*, 543 U.S. 405 (2005)." (ECF No. 42 at 4.)   Outside of addressing K9 Bruno's training as it relates to him "upping" onto Defendant's car, Defendant did not make further arguments on this issue or produce any caselaw supporting his assertion.   The Government argues that K9 Bruno's alert provides sufficient probable cause because K9 Bruno was successfully trained and certified as a narcotics dog, and Trooper Davis and K9 Bruno became certified together through a K9 handler course at the West Virginia State Police Academy.   (ECF No. 45 at 11.)

"Probable cause to conduct a search based on a drug-detection dog's alert exists when the totality of the circumstances, 'viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime.'"   *United States v. Green*, 740 F.3d 275, 282 (4th Cir. 2014) (quoting *Florida v. Harris*, 568 U.S. 237, 248 (2013)).   "[E]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert.   If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search."   *Harris*, 568 U.S. at 246-47.

19

Here, Trooper Davis testified that he and K9 Bruno successfully completed a six-week K9 handler course at the West Virginia State Police Academy and became certified through that course. (Hearing Tr. at 94:7-96:20.) Trooper Davis testified that this training included conducting searches on parcels, vehicles, the interiors and exteriors of objects, and narcotics odor development. (*Id.*) K9 Bruno and Trooper Davis further participate in a mandatory 16 hours per month of training at the State Police Academy, which includes training on detection, tracking, and apprehension, and conduct regular individual trainings together. (*Id.* at 97:2-99:5.) All trainings conducted with K9 Bruno are documented and logged. (*Id.*) Finally, K9 Bruno goes through performance evaluations twice per year which are documented. (*Id.* at 99:6-23.)

Outside of generally challenging K9 Bruno's reliability and certification, Defendant did not produce any evidence or caselaw supporting his assertion that the sniff did not provide the Troopers with probable cause. As the record indicates, K9 Bruno and Trooper Davis successfully completed a bona fide K9 certification course and have since conducted regular trainings and evaluations to ensure K9 Bruno's abilities are accurate. Because there is no evidence that K9 Bruno's training was insufficient or that he has a history of incorrectly identifying narcotics, K9 Bruno's alert on Defendant's car provided Troopers probable cause to conduct a search. *See Harris*, 568 U.S. at 248 ("If the State has produced proof from controlled settings that a dog performs reliably in detecting drugs, and the defendant has not contested that showing, then the court should find probable cause").

D.  Defendant's Statements Against his Interest

Defendant's final argument is that any statements made by Defendant after arriving at the police detachment should be suppressed because Defendant affirmatively invoked his right to an

attorney.   (ECF No. 42 at 6.)   The Government argues that because Defendant stated "I want to walk" after asking for an attorney, and Trooper Cox replied that he was listening to Defendant, Defendant reinitiated the conversation and Trooper Cox did not say or do anything to coerce Defendant into making a statement about the cartel.   (ECF No. 59 at 13.)   At the suppression hearing, the Government stated that they would only seek to admit Defendant's statements that relate to the cartel, and anything after that would not be admitted.   (Hearing Tr. at 5:1-10.) Therefore, this Court will not analyze any of Defendant's later statements that were made off-camera.

Miranda warnings are required prior to any custodial interrogation.   *Miranda v. Arizona*, 384 U.S. 436 (1966).   After asserting their right to counsel, no further questioning may occur of a person without counsel present "unless the accused himself initiate[d] further communication, exchanges, or conversations with the police."   *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). "To establish an *Edwards* violation, a petitioner must show both that he clearly and 'unambiguously' invoked his right to counsel . . . and also that the police subsequently 'interrogated' him."   *Grueninger v. Dir., Virginia Dep't of Corr.*, 813 F.3d 517, 524 (4th Cir. 2016) (internal citations omitted).   "[T]he term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect."   *Rhode Island v. Innis*, 446 U.S. 291, 292 (1980).   "The focus, however, is not upon police intent, but on the suspect's perceptions, the nature of the question asked, and the attendant circumstances." *United States v. Brown*, 163 F.3d 599 *3 (4th Cir. 1998) (unpublished opinion).

Upon entering the office with Trooper Cox, Defendant stated something to the effect of "lawyer, prosecuting attorney. . . . the right people . . . but I want to walk." (*Supra* Part I.D.) Trooper Cox responded that he would "listen" to Defendant. (*Id.*)  Defendant then stated that he could put the Troopers in with the cartel. (*Id.*)  Trooper Cox responded with "keep going, I'm listening to you." (*Id.*)  Defendant repeated that he could put the police in with the cartel. (*Id.*) Defendant then stated that "I want a lawyer, prosecutor." (*Id.*)  Trooper Cox testified that Defendant asked to speak with an attorney and continued to converse with Defendant after that. (Hearing Tr. at 68:17-24.)

In the first instance, it's difficult to discern whether Defendant affirmatively invoked his right to an attorney, but based on Defendant's later statement of "I want a lawyer, prosecutor," it is likely that Defendant was affirmatively requesting a lawyer.  Furthermore, because Trooper Cox testified that Defendant asked to speak with an attorney, it is difficult to interpret the statement in any manner other than Defendant invoking his right to an attorney.  Therefore, because Defendant invoked his right to an attorney, the next part of the suppression analysis is to determine whether Trooper Cox subsequently "interrogated" Defendant.

The Government argues that because Defendant stated, "I want to walk," Defendant re-initiated the conversation after requesting an attorney.  The Court disagrees.  Defendant saying that he wanted to walk was a continuation of the same statement in which Defendant requested an attorney and a prosecutor.  From the moment that Defendant requested an attorney until the moment where he said he wants to walk, Defendant spoke continuously with only very brief pauses in between.  Thus, it should be interpreted as Defendant wanting to make a deal in connection with him wanting to speak with an attorney and a prosecutor.

22

However, Trooper Cox's statement that he would listen to Defendant was not a question or statement that rises to the level of an interrogation.   In *United States v. Blake*, the Fourth Circuit addressed whether an officer's remark of "I bet you want to talk now, huh?" was the functional equivalent of interrogation under the *Innis* standard.   571 F.3d 331, 340 (4th Cir. 2009.)   The district court in *Blake* determined that the conduct "did not 'rise above subtle compulsion,' as it would have to do in order to constitute the functional equivalent of interrogation."   *Id.* (quoting the district court opinion).   The Fourth Circuit affirmed the district court's denial of the defendant's motion to suppress.   *Id.* at 341.   Here, just as in *Blake*, Trooper Cox's statement that he was listening to Defendant did not rise above subtle compulsion to elicit a response from Defendant.   Furthermore, because the focus is on the "the perceptions of the suspect, rather than the intent of the police," the totality of the circumstances did not produce a scenario where Defendant would feel coerced to make the statement about the cartel.   *Innis*, 446 U.S. at 292.   Because Defendant's statement followed his desire to "walk," it could be understood that Defendant made the statement in an attempt to voluntarily cut a deal.   Therefore, although Defendant did affirmatively invoke his right to counsel, his statement was not the product of an interrogation that would elicit such a response.   Defendant's statement shall be admissible.

### III.    Conclusion

For the above-mentioned reasons, Defendant's Motion to suppress is **DENIED** in its entirety.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to the Defendant and counsel, the United States Attorney, the United States Probation Office, and the United States Marshal.

ENTER:      April 17, 2025

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE